Wayne D. **PAULSON** and Diane Paulson, Appellants–Defendants and Counter–Claimants,

v.

**CENTIER BANK f/k/a The First Bank of Whiting,** Appellee–Plaintiff and Counter–Defendant.

No. 56A03–9612–CV–434.

Court of Appeals of Indiana.

Oct. 13, 1998.

Rehearing Denied Dec. 21, 1998.

 Kenneth D. Reed, Abrahamson, Reed, & Adley, Hammond, Indiana, R. Steven Ryan, Barce & Ryan, Kentland, Indiana, for appellants.

Fred M. Cuppy, Kathryn D. Schmidt, Burke Costanza & Cuppy LLP, Merrillville, Indiana, for appellee.

## OPINION

ROBB, J.

Wayne and Diane Paulson appeal the trial court's findings of fact and conclusions of law entering judgment against them and for the First Bank of Whiting (now known as Centier Bank) in the principal amount of $246,977.60 plus accrued interest on the Bank's complaint and also entering judgment against the Paulsons on their counterclaim. We affirm and remand.

*Issues*

■■■■ The Paulsons raise several issues for our review, which we consolidate and restate as:

1. Whether the trial court's findings of fact and conclusions of law met the requirements of Trial Rules 54 and 58 to be a final, lawful judgment;

2. Whether the Paulsons were denied their constitutional right to a fair trial by the fifteen month delay between the bench trial and the entry of judgment; [1]

3. Whether the trial court properly interpreted and applied several legal authorities cited in the findings of fact and conclusions of law; [2]

4. Whether the trial court properly denied the Paulsons' motion for recusal; [3]

---

1. The Paulsons included this allegation of error in their Statement of Issues, and then in their Summary of Argument and again in their Conclusion, the Paulsons allude to the "manifest injustice" of waiting an "unconscionable" amount of time for a judgment to be entered. *See* Appellants' Consolidated Brief at 3, 27, 42. However, the Paulsons have wholly failed to provide any separate argument or authority supporting this contention. Our rules require that each allegation of error be followed by an argument which contains not only the contentions of the appellant, but also the reasons in support of the contentions, citations to the authorities relied upon, and "a clear showing of how the issues and contentions in support thereof relate to the particular facts of the case under review." Ind. Appellate Rule 8.3(A)(7). The Paulsons' failure to present a cogent argument in their brief waives this issue. *See Burnett v. Cincinnati Ins. Co.,* 690 N.E.2d 747, 749 (Ind.Ct.App.1998), *trans. denied.*

By waiving this issue, we do not mean to imply that we sanction such a delay in entering judgment. We note, however, that following the submission of the case to the court, the parties filed a joint stipulation agreeing that the ninety day time limitation for ruling would not apply to this case. Ind. Trial Rule 53.2(A), (B)(1). Notwithstanding this agreed waiver of the time limitation, the trial judge still applied to and received from the Supreme Court numerous extensions of time in which to rule, T.R. 53.1(D), and neither party apparently objected to those requests.

2. The sum of the Paulsons' "argument" with respect to this allegation of error is a reference to their Motion to Correct Errors in the record and a request that we "review [the] same for the sake of brevity; rather than unnecessary reiteration." Appellants' Consolidated Brief at 40. Briefs should be prepared so that each judge, considering the brief alone and independent of the record, can intelligently consider and decide each issue presented. *Town of Merrillville v. Merrillville Conservancy District,* 649 N.E.2d 645, 648 (Ind.Ct.App). issue presented. *Town of Merrillville v. Merrillville Conservancy District,* 649 N.E.2d 645, 648 (Ind.Ct.App.1995), *trans. denied.* The brief must be prepared so that all questions can be determined from an examination of the brief alone because there is only one record to be shared among all the judges. *Id.* at 648–49.

A mere reference in the brief to argument made in a party's motion to correct errors does not comply with the spirit or letter of Appellate Rule 8.3(A)(7). *Wright v. State,* 436 N.E.2d 335, 340–41 (Ind.Ct.App.1982). A brief should not only present the issues to be decided, but it should also be of material assistance to this court in deciding those issues. *Young v. Butts,* 685 N.E.2d 147, 151 (Ind.Ct.App.1997). The Paulsons' failure to provide any argument in their brief in support of this alleged error constitutes a waiver of this issue. *See Burnett,* 690 N.E.2d at 749.

3. After the Paulsons filed their Motion to Correct Errors, they moved for the trial judge to recuse himself from the case. The grounds for this motion are difficult to understand from the motion itself, and the sum total of the Paulsons' argument in their brief is a reiteration of the facts giving rise to the motion. We need not attempt to discern the reasons for this motion or the propriety of its denial, however, because the Paulsons have failed to support this allegation of error with any argument or citations to authority. The issue is therefore waived. *See Burnett,* 690 N.E.2d at 749.

5. Whether the trial court's findings of fact and conclusions of law are clearly erroneous; and

6. Whether the evidence supports the trial court's calculation of damages.

### Facts and Procedural History[4]

■ Beginning in 1981, Wayne Paulson borrowed from the Bank to invest in a series of limited partnerships in which his friend and attorney, Morton Efron, was the general partner [the "Efron investments"]. Wayne testified that he was not in a position financially to participate in the Efron investments, but was given 100% financing by the Bank and assured that distributions from the Efron investments would cover the interest due on the notes, and that when the Efron investments were sold, the proceeds would pay the principal; in the meantime, Wayne believed that no money would be due on the notes. The notes, however, did not contain any provisions to that effect, including only standard repayment terms. Wayne executed several renewals on the notes because the Efron investments did not perform as hoped, and eventually, his wife, Diane, began co-signing renewals.

In 1987, the outstanding balances on Wayne's loans for the Efron investments were consolidated into a single note, signed by both Wayne and Diane at the Bank's request, in the principal amount of $286,-185.69. The Paulsons made several agreements with the Bank to reduce the principal amount of the consolidated note, and although they made a few lump sum payments, they largely failed to follow through with the agreements. In July 1989, the Paulsons signed an "Extension and Modification Agreement," extending the time for payment of the consolidated note to January 1, 1990. When the note came due on that date, the Paulsons defaulted and the Bank sued. The Paulsons answered and filed a counterclaim against the Bank, alleging fraud or constructive fraud, breach of fiduciary duty, and that there was a different agreement than that actually signed based, upon oral statements.

The bench trial took 10 days, concluding on September 28, 1994. On January 9, 1996, the court entered findings of fact and conclusions of law in favor of the Bank on its Complaint, and ruled against the Paulsons on their counterclaims. Several days later, the trial court entered nunc pro tunc findings and conclusions, later explaining that the nunc pro tunc entry was to correct typographical errors in the original entry. The Paulsons filed a motion to correct errors and also a motion for the judge to recuse himself, both of which were denied. This appeal ensued. Additional facts will be supplied as needed.

### Discussion and Decision

### I. Form and Content of Judgment

The Paulsons first contend that because the trial court's judgment reserved ruling on the parties' request for attorney fees and because the judgment does not contain all the formal elements recited in Trial Rule 58(B), the judgment is not a final, lawful judgment within the meaning of Trial Rules 54 and 58. The judgment reads:

Statement of the Case. In addition, the Statement of Facts includes information such as where Mr. Paulson went to high school, and that after college he was drafted into the NFL. Such facts, although interesting, are in no way relevant to the issues presented for review and only hamper our ability to effectively and efficiently decide the cases before us.

We also note that the Paulsons petitioned for and were granted leave to file a brief in excess of the page limitation of Appellate Rule 8.2(A)(4)(a). We believe the extra pages allowed them would have been put to better use in the argument section of their brief, as evidenced by the numerous issues we have waived for failure to provide cogent argument in support thereof.

4. Although we acknowledge that the events which resulted in this litigation began in 1981, and culminated in a ten-day bench trial in 1994, which constitutes a twenty volume record, we caution Paulsons' counsel that the fifteen page Statement of the Facts in their Consolidated Brief does not comport with the requirements of Appellate Rule 8.3(A)(5). Our rules require "[a] statement of facts *relevant to the issues presented for review,*" Ind. Appellate Rule 8.3(A)(5) (emphasis added), which should be a *concise* narrative summary of the facts in a light most favorable to the judgment. *Summit Account & Computer Serv. v. RJH of Florida, Inc.,* 690 N.E.2d 723, 724 n. 1 (Ind.Ct.App.1998), *trans. denied.* A large part of the Paulsons' Statement of Facts would have been more appropriately included in the

Based upon the foregoing findings and conclusions, the Court NOW ORDERS, ADJUDGES AND DECREES that Wayne and Diane Paulson are liable to Centier Bank on the Note executed for the sum of $246,977.60, together with accrued interest of $194,115.83 based upon per diem interest from August 10, 1984 at $101.19 per day.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Paulsons shall take nothing by way of their counterclaims.

The Court now sets this matter for hearing on the 28th day of February, 1996 to determine the issue of attorney fees.

R. 2615.

■ Trial Rule 54(B) provides that a judgment which adjudicates one or more but less than all of the claims of the parties in a given action is interlocutory and not appealable unless the trial court, in writing, "expressly determines that there is no just reason for delay, and ... expressly directs entry of judgment...." Although it is true that the judgment as set forth above reserved the question of attorney fees and did not expressly direct entry of judgment as to the other claims decided therein, as required by Trial Rule 54(B), we fail to see, and the Paulsons have not alleged, how they have been prejudiced by this omission.

■ The purpose of Trial Rule 54(B) is to avoid piecemeal litigation and appeal of various issues in a case and to preserve judicial economy by protecting against the appeal of orders that are not yet final. *Chesterfield Management, Inc. v. Cook,* 655 N.E.2d 98, 100 (Ind.Ct.App.1995), *trans. denied.* In this case, the Paulsons filed a motion to correct errors pursuant to Trial Rule 59, indicating that they believed the trial court's order to be final as to the claims decided therein.[5] Also, the trial court held a single hearing on both the Paulsons' motion to correct error and the Bank's application for attorney fees, and in a single order, denied the motion to

correct errors and entered judgment for the Bank as to the attorney fees. Therefore, all claims were finally decided in the trial court by that order and the Paulsons' time for appealing any and all issues to this court began, eliminating any concern over piecemeal litigation or judicial economy.[6] In addition, the parties made a *joint* motion immediately prior to trial to bifurcate the issue of attorney fees, which the trial court granted, directing that "in the event that attorney's fees are ordered, there shall be a subsequent hearing as to the amount of said fees." R. 165. The parties clearly anticipated the exact procedure employed here: that a judgment as to all issues but attorney fees would be entered, and in the event that the court ordered payment of attorney fees, a separate hearing would be held as to that issue.

■ Likewise, the Paulsons have not been prejudiced by the trial court's failure to comply with the dictates of Trial Rule 58(B). Trial Rule 58(B) requires that a judgment contain certain information, some of which the judgment in this case does not contain. However, the "sufficiency of a judgment 'is to be tested by its substance rather than its form.'" *Henderson v. Sneath Oil Co., Inc.,* 638 N.E.2d 798, 803 (Ind.Ct.App.1994) (quoting 46 Am.Jur.2d *Judgments* § 64). The trial court's judgment clearly specifies the result on both the Bank's claim and the Paulsons' counterclaim, and makes a certain and definite statement of the amount of the money judgment awarded. The form and content requirements of Trial Rule 58(B) are primarily related to the management of court records as opposed to the validity of the judgment itself. *Id.* However, because Trial Rule 58(B) requires that a judgment contain specific elements, and because the judgment herein does not meet those requirements, we remand for the trial court to prepare, sign and enter its judgment in accordance with the rule.

---

5. "The motion to correct error, if any, shall be filed not later than thirty (30) days after the entry of a *final judgment or an appealable final order.*" Ind. Trial Rule 59(C) (emphasis added).

6. Notably, the Paulsons have not raised any allegation of error in the trial court's award of attorney fees to the Bank, which was the only claim not fully and finally decided by the court's findings of fact and conclusions of law.

## II. Findings of Fact and Conclusions of Law [7]

The Paulsons allege numerous errors in the trial court's findings of fact and conclusions of law.

### A. Standard of Review

 In entering judgment in favor of the Bank, the trial court entered specific findings of fact and conclusions of law pursuant to a request by the Paulsons. When a party has requested specific findings of fact and conclusions of law thereon pursuant to Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind.1998). However, before affirming on a legal theory supported by the findings but not espoused by the trial court, the reviewing court should be confident that its affirmance is consistent with all of the trial court's findings of fact and the inferences drawn therefrom. *Id.*

 In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Ahuja v. Lynco Ltd. Medical Research*, 675 N.E.2d 704, 707 (Ind.Ct.App.1996), *trans. denied.* The findings and judgment will not be set aside unless they are clearly erroneous. *Culley v. McFadden Lake Corp.*, 674 N.E.2d 208, 211 (Ind.Ct.App.1996). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Ahuja*, 675 N.E.2d at 707. A judgment is clearly erroneous when it is unsupported by the findings of fact. *Id.* In determining whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

### B. Bank Employee Acting as an Individual with Respect to the Efron Investments (Finding # 29) [8]

 The Paulsons allege that the trial court erred in finding that the Bank did not know until the instant litigation was commenced that Donald Cassaday, one of their employees, had acted as an offeree representative with respect to the Efron investments for several investors (although not for the Paulsons) and had acted as an individual in arranging loans through the Bank for those who wished to invest. This finding was apparently made in response to the Paulsons allegation that the Bank, Mr. Cassaday, and Mr. Efron were involved in a conspiracy to invest Bank funds in the Efron investments using the Paulsons and other individuals as a conduit.

Wayne Paulson testified that his dealings at the Bank were with Mr. Cassaday, and that "everybody else in the Bank kind of wasn't involved in those Notes. . . ." R. 1842. The President of the Bank testified that he was not aware that Mr. Cassaday had acted as an offeree representative in any capacity and that the Bank had not approved such conduct. R. 1166–70. The Paulsons' own brief states that "[t]he record is clear that the Bank had absolutely no files on the Efron Investments, and knew nothing of the underlying assets when it made the loans." Appellants' Consolidated Brief at 37–38. In addition, Mr. Cassaday was not acting in a dual capacity with respect to the Paulsons. There is evidence in the record to support the trial court's finding that Mr. Cassaday was acting as an individual and not through or with the Bank in being personally involved in the Efron investments as an offeree representative. Therefore, the finding is not clearly erroneous and we will not set it aside. *See Ahuja*, 675 N.E.2d at 707.

---

7. The Paulsons' argument on many of the issues they raise fails to comply with Appellate Rule 8.3(A)(7), which requires a cogent argument supporting each allegation of error. *See Burnett*, 690 N.E.2d at 749. To the best of our ability we have tried to discern the Paulsons' contentions and address the merits thereof.

8. In their Statement of Issues, the Paulsons raise several other issues with respect to the trial court's findings of fact; however, they have failed to carry these issues through to the argument section of their brief. Appellants' Consolidated Brief at 3, 37. Those issues are therefore waived. *See Burnett*, 690 N.E.2d at 749.

## C. Lack of Fiduciary Duty (Conclusion # 2)

The Paulsons allege that the trial court erred in making the following conclusion:

[The] Bank's relationship with the Paulsons in this proceeding amounted to a debtor-creditor relationship and no fiduciary duty arose on the part of [the Bank] as to the Efron Investments.

R. 2610.

"A fiduciary relationship does not exist between a lender and a borrower unless certain facts exist which establish a relationship of trust and confidence between the two." *Block v. Lake Mortgage Co., Inc.*, 601 N.E.2d 449, 452 (Ind.Ct.App.1992) (citing *Mantooth v. Federal Land Bank*, 528 N.E.2d 1132, 1138–39 (Ind.Ct.App.1988), *trans. denied*). A confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind.Ct.App.1983) (quoting *Hunter v. Hunter*, 152 Ind.App. 365, 283 N.E.2d 775, 779 (1972)). Not only must there be confidence by one party in the other, but the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. *Id.* Furthermore, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage. *Id.* Whether such a relationship exists is essentially a question of fact. *See Mantooth*, 528 N.E.2d at 1139.

The evidence adduced at trial indicated that it was Mr. Efron in whom the Paulsons reposed trust and confidence, that it was Mr. Efron who was Wayne's longtime friend and attorney, and that it was to Mr. Efron that the Paulsons looked for advice. R. 1848, 1871, 1958. Wayne made the decision to invest in the Efron investments at the urging of Mr. Efron and went to the Bank to secure the loan as suggested by Mr. Efron. There was no evidence that the Paulsons reposed confidence in the Bank, that the Bank offered advice or made any representations about the soundness of the investment, or that the Bank gained any unconscionable advantage over the Paulsons in the loan transactions. The trial court's conclusion that the Bank owed the Paulsons no fiduciary duty, and therefore, its judgment against the Paulsons on their counterclaim for breach of fiduciary duty, is not clearly erroneous.

## D. Failure to Prove Fraud (Conclusion # 11)

The Paulsons also allege that the trial court erred in concluding that:

. . . Paulsons' Counterclaim fails to state a claim in fraud for the reason that any representation in which the fraud would be predicted [sic] is not a representation of existing facts, but would at most be a promise to be performed in the future, i.e., that the loans would be only paid in the future from funds available from the investment can only be characterized as a statement of opinion, hope or expectation.

R. 2613.

The trial court did not err in making this conclusion. The Paulsons did not prove actual fraud based upon the representations they alleged. Actual fraud consists of five elements: 1) that there was a material representation of *a past or existing fact;* 2) that the representation was false; 3) that the representation was made with knowledge of its falsity; 4) that the complainant relied on the representation; and 5) that the representation proximately caused the complainant's injury. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind.Ct.App.1998), *trans. denied.*

Any representations that the Bank or the Bank's employees allegedly made when the Paulsons signed the credit instruments to the effect that the notes would not be due until the Efron investments were sold were not representations of a *past or existing fact;* rather, they would be representations regarding future conduct, and such representations cannot support an action for actual fraud, as the trial court properly concluded.

However, a representation of future conduct can, in some instances, give rise to a claim for constructive fraud. *Wells*, 691 N.E.2d at 1250. Constructive fraud consists

of: 1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complainant; 4) injury to the complainant as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complainant. *Id.* at 1250–51.

■ As we have already addressed the trial court's conclusions that Mr. Cassaday acted as an individual and that the Bank did not owe the Paulsons a fiduciary duty, we merely note here that the Paulsons also failed to prove constructive fraud in that there was no special relationship between the Bank and the Paulsons giving rise to a duty by the Bank, nor did the Bank gain any advantage in their relationship with the Paulsons. The Bank loaned a substantial amount of money to the Paulsons pursuant to promissory notes signed by the Paulsons by which they agreed to repay the note in certain terms. The Bank received little or no repayment in the nine years prior to this lawsuit commencing. The trial court's conclusion is not clearly erroneous.

### E. Applicability of the Lender's Liability Statute (Conclusion # 10)

The Paulsons allege that the trial court erred in concluding that:

> In this case, the Execution and Modification Agreement signed on July 1, 1989 ... is covered by the [Lender Liability Statute, Ind.Code §§ 32–2–1.5–1 to –5] and, therefore, the Paulsons' Counterclaim attempting to allege an oral agreement is barred as there is no written document confirming any of the material terms and conditions of the Paulsons' alleged "agreement" with [the Bank] that their loan would not have to be repaid until the monies became available from the Efron investments.

R. 2613. The Paulsons' primary assertion of error with respect to this conclusion of law is that the Lender Liability Act did not become effective until July 1, 1989, and because the Agreement signed by the Paulsons on that date was an extension and modification of credit agreements entered into *prior* to that date, the Act should not apply.

Indiana's Lender Liability Act provides that:

> A debtor may bring an action upon an agreement with a creditor to enter into a new credit agreement, amend or modify a prior credit agreement, forbear from exercising rights under a prior credit agreement or grant an extension under a prior credit agreement only if the agreement:
>
> (1) is in writing;
>
> (2) sets forth all the material terms and conditions of the agreement; and
>
> (3) is signed by the creditor and debtor.

Ind.Code § 32–2–1.5–5. A "credit agreement" is defined as an agreement to "lend or forbear repayment of money, goods, or things in action; otherwise extend credit; or make any other financial accommodation." Ind.Code § 32–2–1.5–1.

The Paulsons' counterclaim alleging that the notes signed by Wayne did not represent the true agreement of the parties with respect to repayment of the loans is based upon the circumstances surrounding the execution of the original notes in 1981, 1982, and 1983. These notes were consolidated into a single note signed by both Wayne and Diane in 1987. The maturity date of the consolidated note was extended by agreement twice, the last agreement being dated July 1, 1989.

■ We agree with the Paulsons that the Lender Liability Act does not apply to bar their counterclaim. The July 1, 1989 agreement rewrote the original promissory note to reflect a maturity date of January 1, 1990, "the same as if said Note were originally written to come due on that date." R. 2784. The parties were still relying on the promissory note dated prior to July 1, 1989, which was clearly outside the Act.

Notwithstanding the trial court's error in applying the Lender Liability Act, we may affirm the trial court's judgment against the Paulsons on their counterclaim on any legal theory supported by the findings. *Mitchell,* 695 N.E.2d at 923. The trial court found that "[t]here is no question that Mr. Paulson understood that these loans being made by [the Bank] were 'actual loans' in light of the execution of the documents themselves, and

**492**

the ... renewal of those notes and his expertise as a businessman and as a former bank director." R. 2599. The court then concluded that "specific promissory notes with maturity dates were executed by the Paulsons. The Court cannot ignore the plain language of the debt instruments, the security agreements, and the modification and extension agreements executed by the Paulsons." R. 2611.

■■■■■ Without explicitly stating so, the trial court also relied upon the parol evidence rule in concluding that the alleged oral agreement did not vary the plain terms of the promissory notes signed by the Paulsons and by entering judgment against them on their counterclaim. The parol evidence rule excludes any extrinsic evidence of prior or contemporaneous oral agreements offered to vary or contradict the terms of a written agreement. *Tincher v. Greencastle Fed. Sav. Bank.* 580 N.E.2d 268, 271 (Ind.Ct.App. 1991).[9] The Paulsons signed a series of promissory notes which contained maturity dates and terms for repayment, and nowhere in the four corners of those instruments was any contingency or condition precedent to repayment, as the oral agreement alleged by the Paulsons provided. The Paulsons breached the contract by failing, even after several extensions of the original maturity dates, to meet the repayment terms. The trial court's judgment with respect to the Paulsons' counterclaim was not, therefore, clearly erroneous.

F. Unavailability of 12 C.F.R. § 202.7 as a Defense (Conclusions # 13, 14)

The Paulsons further allege that the following conclusions were in error:

13. As to the affirmative defense under Regulation B and in more particular [sic], 12 C.F.R. § 202.7 that regulation was enacted on November 20, 1985, is not applicable to the credit instruments executed herein because the initial credit transaction Diane Paulson signed was executed on

January 9, 1985, ... previous to the passage of that Act. Notes signed thereafter were merely renewals and consolidations of prior debt.

14. The Court further finds that [the] Bank did not require Diane Paulson's signature, in any event, on the credit instruments until after it was determined that Wayne Paulson was not independently credit worthy; thus [the Bank] did not discriminate against Diane Paulson on the basis of marital status.

R. 2614.

Diane Paulson asserted as an affirmative defense that requiring her signature on the consolidated promissory note was in violation of the Equal Credit Opportunity Act ("ECOA"), which makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, ... on the basis of ... marital status...." 15 U.S.C. § 1691(a). In particular, Diane asserted that the Bank violated the following regulation:

Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

12 C.F.R. § 202.7(d)(1).

■■■ The trial court's conclusion that the Bank did not violate the ECOA in any of its dealings with the Paulsons is supported by the findings. The trial court found, and the evidence showed, that several of the financial statements Wayne provided to the Bank to support the loans for the Efron investments were joint financial statements which included Diane's individual assets. R. 2600–01. However, only after Wayne and various businesses owned by him began to experience financial difficulties did the Bank request that Diane also sign the credit instruments being executed by Wayne to extend and mod-

9. Parol evidence may be considered to show fraud, unintentional misrepresentation or mistake in the formation of the contract, or to "shed light upon the circumstances under which the parties entered into the written contract." *Mill-*

*ner v. Mumby*, 599 N.E.2d 627, 629 (Ind.Ct.App. 1992). However, the trial court found, and we agree, that there was no fraud in the Bank's dealings with the Paulsons.

ify the terms of the existing agreements. R. 2607. Prior to that time, Wayne alone signed the promissory notes. The determinative factual question was whether the Bank made a determination that Wayne was not independently creditworthy before it required Diane's signature. *See Riggs Nat. Bank of Washington, D.C. v. Linch,* 36 F.3d 370, 374 (4th Cir.1994) (holding that Riggs did not violate the ECOA by requiring Linch's wife to sign as a guarantor of a loan secured by Linch after Riggs discovered that Linch did not individually own many of the assets which he had represented to be his alone on the personal financial statement he submitted with the loan application.). The trial court answered that question in the affirmative, and its conclusion based thereon is not clearly erroneous.

### III. Calculation of Damages

Finally, the Paulsons challenge the trial court's award of damages. The trial court determined that the Paulsons were indebted to the Bank "for the sum of $246,977.60, together with accrued interest of $194,115.83 based upon per diem interest from August 10, 1984[10] of $101.19 per day." R. 2615. The Paulsons allege that "it just isn't possible, from the record of proceedings in this cause, or from the Court's Special Findings and Conclusions, to find any evidentiary basis, from which the trial court made [the damage] calculations." Appellants' Consolidated Brief at 40.

■ An award of damages is a matter within the sound discretion of the trial court and will not be reversed unless it is unsupported by the evidence. *Scott–Reitz Ltd. v. Rein Warsaw Assoc.,* 658 N.E.2d 98, 105 (Ind.Ct.App.1995). The trial court's damage award is supported by the evidence. However, because we are unsure of the exact amount of interest the trial court intended to award, we remand to the trial court for clarification.

■ The evidence shows that the Paulsons, with a payment on September 29, 1989, had brought the interest on their note current as of July 1, 1989. R. 2873–74. A Commercial Loan Officer for the Bank prepared a report as of August 10, 1994, computing the interest due on the note from July 1, 1989. R. 364, 2875–76. *As of* August 10, 1994, the accrued interest was $194,115.83. Interest continued to accrue *from* August 10, 1994 at the rate of $101.19 per day. From the wording of the trial court's judgment and from the finding of fact which states that "[t]here is presently due and owing on the note ... accrued interest of $191,115.83[11] *through* August 10, 1994 based upon per diem interest *from* August 10, 1994 running at $101.19 per day[,]" r. 2605 (emphasis added), we are unsure whether the damage award is intended to include only the interest due *as of* August 10, 1994, or whether it is intended to also include that interest due *from* August 10, 1994. We therefore remand with instructions to the trial court to specifically limit its damage award to the accrued interest as of August 10, 1994 or to calculate and include in the total award the interest due from August 10, 1994, based upon the per diem rate of interest.

### IV. Conclusion

The evidence adduced at the bench trial supports the trial court's findings, and the findings support the judgment against the Paulsons. However, because the judgment does not comport with the procedural requirements of Trial Rule 58(B), and because the damage award requires clarification, we remand to the trial court for modification of the judgment. The trial court is, in all other respects, affirmed.

Affirmed and remanded.

STATON, J. concurs.

KIRSCH, J. concurs in result.

---

10. The "1984" is most likely a typographical mistake as the evidence and the findings of fact show that the accrued interest figure was calculated through August 10, *1994.* R. 2605, 2876.

11. This figure is also apparently a typographical error, as the evidence and the judgment both support an accrued interest figure of $194,-115.83.