**Jay LYNN and Sandra Lynn, Appellants–Defendants,**

v.

**WINDRIDGE CO–OWNERS ASSOCIATION, INC., Appellee–Plaintiff.**

No. 49A02–0005–CV–299.

Court of Appeals of Indiana.

Jan. 26, 2001.

Rehearing Denied March 7, 2001.

Mark Small Indianapolis, IN, Attorney for Appellants.

John S. Keeler, Elizabeth Cierzniak, Baker & Daniels, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellants-defendants Jay and Sandra Lynn (the Lynns) appeal the trial court's judgment in favor of Windridge Co–Owners Association, Inc., (the Association) finding the Lynns liable for assessment and re-measure costs, late charges, and attorney fees with respect to their ownership of a condominium unit at Windridge. The Lynns raise several claims, which we consolidate and restate as whether the trial court erred in: 1) concluding that the Association lawfully assessed the Lynns for the additional square footage resulting from expansion of their condominium unit; 2) finding that the Lynns presented no credible evidence regarding damages or setoffs in defense of their nonpayment of assessments; 3) determining that the Lynns were responsible for assessments levied by the Association after their voting rights were suspended for nonpayment; 4) determining that the Lynns were responsible for the payment of compounded late fees for overdue assessments; and 5) awarding attorney fees to the Association.

### FACTS

The facts most favorable to the judgment indicate that the Windridge Horizontal Property Regime (Windridge) was established in 1975 and includes 221 condominium units located on the northeast side of Indianapolis. The Lynns own a condominium unit[1] at Windridge and have lived there since 1979. As owners of a condominium unit, the Lynns are automatically members of the Association, which is a mutual benefit corporation incorporated pursuant to the Indiana Nonprofit Corporation Act (Act).[2] The Association is governed by a Board of Directors (Board) and is responsible for maintaining the property and purchasing casualty insurance for the exterior condominium structures.

Services provided by the Association to its condominium owners are underwritten by assessments, which are levied fourteen times a year. The amount of each owner's assessment is based upon the square footage of the owner's condominium unit as a percentage of the total square footage at Windridge. According to the Association's Bylaws, the Board may levy a penalty of up to 25% for late payment of assessments. Effective March 1, 1995, the Board passed a motion to impose a late fee of $10.00 for payments more than six days overdue.

Sometime in 1993 or 1994, the Lynns obtained permission from the Association

---

1. Hereafter, to be consistent with the definitions used by Indiana's Horizontal Property Law, we will use the term "condominium unit" to refer to the owner's individual dwelling and the term "condominium" to refer to the entire property regime. Ind.Code. § 32–1–6–2.

2. Ind.Code § 23–17–1–1 to –30–4.

to add an extension to their condominium unit. Construction of this extension was completed in late 1994 or early 1995. Subsequently, in April 1995, the Association sent the Lynns a letter informing them that their condominium unit would need to be re-measured in order to adjust their assessment and incorporate the extension into Windridge. The letter also advised the Lynns that they would be responsible for the $200 re-measurement cost. As a result of the re-measurement, the Board advised the Lynns on May 5, 1995, that their assessment cost would be increased to reflect their additional square footage.

The Lynns disputed the Association's authority to increase their assessment due to the extension of their condominium unit. They also asserted that the Association was responsible for maintenance costs for a sunroom they built in 1981. In addition, the Lynns engaged in a dispute with the Board regarding their dissatisfaction with certain maintenance services provided by the Association. Consequently, in 1995 the Lynns began offsetting the cost of such services from their assessment and paying late. They also refused to pay the $200 re-measurement cost. In 1996, the Lynns missed several installments and continued to refuse to pay the increased assessment costs. From April 1997 until the date of trial, the Lynns made no payments to the Association. Nevertheless, the Association continued to provide the Lynns with maintenance services and insurance coverage. R. at 804–06. In December 1997, the Board suspended the Lynns' voting rights for nonpayment of assessments. By the time of trial in November 1999, the Lynns owed the Association a total of $18,969.44, including $4,065 attributable to the increased square footage.

In September 1995, a contractor brought suit against the Lynns and Windridge to foreclose on a mechanic's lien in connection with improvements the contractor made on the Lynns' condominium unit in 1994.[3] Windridge then filed a cross-claim against the Lynns alleging that they were liable to it for assessments, re-measure charges, late fees, and attorney fees. In response, the Lynns filed a counterclaim against Windridge, which the trial court dismissed before commencement of trial as sanctions for discovery violations. Nevertheless, at the bench trial on Windridge's cross-claim on November 8, 1999, the trial court permitted the Lynns to testify regarding their defenses for nonpayment, which included their assertion that they had a right to damages and to offset amounts owed to them by the Association for various maintenance, repair, and replacement costs. Thereafter, the trial court issued special findings of fact and conclusions of law, and entered judgment in favor of the Association in the total amount of $26,859.44. The Lynns now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

This court applies a two-tiered standard of review to special findings entered by the trial court pursuant to Ind. Trial Rule 52. *Oil Supply Co. v. Hires Parts Service Inc.*, 726 N.E.2d 246, 248 (Ind.2000). First, we determine whether the evidence supports the findings, and, second, we determine whether the findings support the judgment. *Paulson v. Centier Bank*, 704 N.E.2d 482, 489 (Ind.Ct.App. 1998), *trans. denied.* Special findings and the judgment which rests upon those findings will be set aside only if they are clearly erroneous in that the record is devoid of facts or inferences to support the findings, or that the judgment is unsupported by the findings. *Id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* R. at 532.

---

**3.** The contractor's suit was subsequently resolved in mediation on November 26, 1997.

## II. The Lynns' Claims

### A. Assessment for Increased Square Footage

■ The Lynns first contend that the trial court erred in concluding that the Association lawfully assessed them for the additional square footage resulting from expansion of their condominium unit. According to the Lynns, they were not obligated to pay the increased assessment when it was imposed in 1996 because the Association was not authorized to reallocate the percentage interests of owners after October 4, 1995, and because the Association did not record the supplemental declaration reallocating that percentage interest until after that date.

We initially note that Windridge was established as a horizontal property regime pursuant to Indiana's Horizontal Property Law (HPL).[4] Windridge was specifically established as an "expandable condominium," meaning a condominium to which real estate may be added in phases as new condominium units are built. I.C. § 32–1–6–2; I.C. § 32–1–6–12.1. The HPL sets a ten-year time limit within which such expansion must occur. I.C. § 32–1–6–12.1. Pursuant to this statutory directive, Section 16 of the Ninth Amendment to and Restatement of Declaration of Horizontal Property Ownership—Windridge Horizontal Property Regime (Declaration) prohibits the addition of real estate to the condominium after October 4, 1995 (the "drop dead date"). R. at 832.

The Lynns point to Section 16 of the Declaration to support their assertion that they are not liable for increased assessments due to expansion of their condominium unit, as the Association no longer had authority to reallocate percentages after the "drop dead date." However, we observe that Section 16 refers only to Windridge's annexation of "additional Dwelling Units on the Additional Tracts," not to the expansion of individual condominium units. R. at 832. Further, Section 16 specifically refers to Section 31, which pertains to "Enlargements of dwelling units," as an exception to application of the "drop dead date." R. at 835–36, 842.[5] Thus, the Association was not prohibited from reallocating the Lynns' percentage interest after the "drop dead date" to reflect the expansion of their condominium unit.

■ Nevertheless, the Lynns also argue that they were not obligated to pay the increased assessment when it was imposed in January 1996 because reallocation of the percentage of each owners' interest did not vest until the supplemental declaration was recorded in June 1999. Specifically, the HPL provides that "[t]he reallocation of [the] percentage of undivided interests in the common areas and facilities shall vest when the amendment to the declaration incorporating [any] changes has been recorded." I.C. § 32–1–6–15.2(b). Thus, the Lynns assert that the reallocation was not vested, or due, when the Association imposed the increased assessment in January 1996 and, therefore, they were not liable for payment.

We note, however, that § 32–1–6–15.2(b) pertains to "reallocation of [the] percentage of undivided interests in common areas and facilities," and does not address reallocation of percentages when an owner enlarges his individual condominium unit. Moreover, while Section 31 of the Windridge declaration provides that "[u]pon the completion of any enlargement [of a condominium unit] the Association shall execute and record a Supplemental Declaration," it contains no language suggesting

---

4.  I.C. § 32–1–6–1 to –31.

5.  Paragraph 31 does reference the "drop dead" date inasmuch as it establishes that owners of condominium units may enlarge their units up until the date when the Association is no longer "permitted to expand the Regime by addition of Dwelling Units," which corresponds to October 4, 1995. R. at 842. However, Paragraph 31 contains no language to the effect that the Association's authority to reallocate the owners' percentage of interest expires after that date.

that any resulting reallocation is not valid until, or unless, the declaration is recorded. R. at 843. Therefore, the Association could lawfully impose an increased assessment for the addition to the Lynns' condominium unit despite not having recorded the supplemental declaration.

■ Moreover, even if we had concluded that the Association's failure to record the declaration precluded it from imposing the increased assessment, the Lynns received the value of services rendered by the Association and, therefore, they are obligated to pay for those services under the theory of *quantum meruit.* *Quantum meruit* is a legal fiction created by courts that provides a remedy to prevent unjust enrichment by affording the injured party the fair value of services rendered. *Wright v. Pennamped,* 657 N.E.2d 1223, 1229 (Ind.Ct.App.1995), *trans. denied.* Principles of justice and equity dictate that a party should not be unjustly enriched in cases where that party accepts the unrequested benefits another provides despite having the opportunity to decline those benefits. *Id.* Here, the Association President, Ms. Rasmussen, testified at trial that the Lynns continued to receive maintenance services despite their repeated failure to pay their assessment, and there is no evidence in the record indicating that the Lynns made any attempt to refuse those services.[6] R. at 804–06. Such enrichment by the Lynns is unjust and inequitable. *Id.* Thus, we must conclude that the Association's failure to record the supplemental declaration until 1999 did not relieve the Lynns of their obligation to pay the increased assessment resulting from expansion of their condominium unit.

## B. Setoffs or Damages

■ The Lynns next contend that the trial court erred in concluding that they presented no credible evidence in defense of their nonpayment. Specifically, the Lynns claim that they were entitled to setoff repair costs for their sunroom, for payment of an insurance deductible for a damaged air conditioning unit, for payment to outside contractors for snow removal and lawn care services, and for legal fees incurred by the Lynns in defending this action.

■ In addressing the Lynns' contention, we note that they are appealing from a negative judgment by the trial court. A party appealing a negative judgment must establish that the evidence is without conflict and leads to but one conclusion and that the trial court did not reach that conclusion. *OVRS Acquisition Corp. v. Cty. Health Servs. Inc.,* 657 N.E.2d 117, 125 (Ind.Ct.App.1995), *trans. denied.* The appellant can attack the trial court's judgment only as contrary to law. *Id.* In determining whether the judgment is contrary to law, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* Instead, we will consider only the evidence most favorable to the judgment together with all reasonable inferences which may be drawn therefrom. *Id.*

Here, the record reveals that the Lynns were not entitled to offset repair costs incurred for their sunroom, as the Association's 1981 letter to the Lynns authorizing construction of the sunroom specifically states that the Lynns were to be responsible for its maintenance and insurance. R. at 981, 1052. Further, with respect to other costs offset by the Lynns, we note that they have provided no documentation to substantiate those costs except for a spreadsheet prepared by Jay Lynn. Consequently, the Lynns' allegation that the Association owed them for payment of an

6. The record indicates that there was a brief cessation in maintenance services to the Lynns in mid 1999, after an altercation between Jay Lynn and two employees. R. at 810. Services were resumed shortly thereafter with the proviso that maintenance crews would only be dispatched to the Lynns' condominium when a Board member was present. R. at 804.

insurance deductible and fees for outside contractors, is unsupported by receipts, invoices, cancelled checks, or other evidence beyond their own self-serving testimony and spreadsheet. Thus, the evidence adduced by the Lynns does not lead to but one conclusion opposite that reached by the trial court. Moreover, inasmuch as the Lynns have not established that the Association failed to comply with the Horizontal Law, Articles of Incorporation or Bylaws, they are not entitled to an award of attorney fees. In sum, we find no error.

## C. Assessment After Suspension of Voting Rights

■ According to the Lynns, they are not liable for any assessments levied after the Association suspended their voting rights. To support this contention, they point to a provision of the Act governing liability for obligations after suspension, which provides:

A member who has been expelled or suspended . . . may be liable to the corporation for dues, assessments, or fees as a result of obligations incurred or commitments made *before* expulsion, suspension, or termination.

I.C. § 23–17–8–2(e) (emphasis supplied). The Lynns focus on inclusion of the word "before" in the statute, to argue that they are not required to pay for assessments levied after suspension of their voting rights.

However, another provision of the Act, headed "Liability for obligations," provides that "nonpayment constitutes grounds for expelling or suspending [a] member . . . [and] the validity of mandatory membership and the validity of a lien imposed by a recorded declaration of covenant . . . is not affected by" the member's suspension. I.C. § 23–17–7–7(a). Further, Windridge's Declaration provides that:

*[U]pon recording of this Declaration* and any subsequent Supplemental Declaration, all the rights and *obligations accruing to a Dwelling Unit* shall accrue to each Dwelling Unit contained within the Tract *including* but not limited to *the obligation to pay monthly assessments* as provided in such Declaration, which monthly assessments *are a lien on each Dwelling Unit*

. . . .

R. at 839 (emphasis supplied). The Declaration was recorded on August 8, 1994, and the Association suspended the Lynns' voting rights for nonpayment of assessments in December 1997. Therefore, in construing the above provision of the Act and Windridge's Declaration, we find that the Lynns' obligation to pay the monthly assessment constituted a lien on their condominium unit, for which they remained liable even after suspension of their voting rights.

Nevertheless, the Lynns assert that they are not liable for the payment of assessments levied after their voting rights were suspended because the Association denied them due process rights to challenge that suspension. According to the Lynns, "a suspension of their obligation to pay assessments would appear to be a proportional sanction" for the Associations' failure to afford them fifteen days prior written notice of suspension or a pre-suspension hearing as required by the Act.[7] Appellant's reply brief at 8.

Inasmuch as the Lynns cannot be allowed to benefit unjustly from their nonpayment of assessments, we must reject their due process argument. To do otherwise, would sanction the untenable result that members who have been suspended by their Association for nonpayment could

7. Specifically, I.C. § 23–17–8–2(a) provides that a member of a public benefit or mutual benefit corporation may not be expelled or suspended except under a procedure that is fair and reasonable and carried out in good faith. The statute further provides that a procedure is fair and reasonable if it either af-

fords fifteen days prior written notice of suspension or an opportunity to be heard not less then five days before the effective date of the suspension, or the procedure is fair and reasonable taking into consideration all of the relevant facts and circumstances.

continue to enjoy maintenance and insurance services at no cost to them. Moreover, notice was provided to the Lynns that suspension is warranted for nonpayment of assessments. Specifically, Section 5.5 of the Articles of Incorporation states that members shall be suspended for nonpayment of assessments upon a majority vote of the Board. R. at 760. As recounted in the *FACTS,* the Lynns started offsetting the alleged cost of services against their assessments as far back as 1995, began missing installments and refused to pay the increased assessment costs in 1996, and ceased making any assessment payments whatsoever in 1997. In light of this behavior, it was neither unreasonable nor unforeseeable that the Association would ultimately decide to suspend the Lynns' voting rights. Thus, the trial court did not err in determining that the Lynns were responsible for assessments levied by the Association after it suspended their voting rights for nonpayment.

### D. Compounded Late Fees

The Lynns also contend that the trial court erred in determining that they are responsible for the payment of compounded late fees for overdue assessments. Specifically, the Lynns assert that the Association lacked authority to compound late fees because the Board adopted the practice of compounding these fees by agreement rather than by casting votes as required by I.C. § 23–17–11–5, the provision of the Act that governs voting and approval of actions by the Board.

In addressing the Lynns' contention, we note that the Articles of Incorporation and Bylaws of a not-for-profit corporation constitute a contract between the corporation and its members and among the members themselves. *Ind. High Sch. Athletic Ass'n. v. Carlberg,* 694 N.E.2d 222, 230 (Ind.1997). In this instance, Windridge's Articles of Incorporation authorized the Association to "[t]o establish, levy, collect and enforce payment by any lawful means of any charges or assessments made against Members … pursu-

ant to the terms of the Declaration." R. at 757. The Bylaws specifically provide that, where an owner fails to make timely monthly payments of any assessment, the Board may "impose a late charge of up to twenty-five percent (25%) of the amount in default which shall become part of the assessment." R. at 774.

In accordance with its authority under the Bylaws, in its February 1995 meeting, the Board passed a motion to assess a late fee of $10.00 for payments made more than six days late. R. at 923. Three years later, during its April 1998 meeting, the Board "agreed that late fees are to be compounded." R. at 929. The Lynns argue that the Board was not authorized to compound the fees because it adopted this practice by agreement rather than by vote. Appellant's brief at 29.

Even though the minutes of the April 1998 meeting do not specifically state that there was a vote, they do state that the Board "agreed" that the late fee should be compounded. The very fact that the Board "agreed" to compound these fees indicates that there was discussion of the issue and a subsequent manifestation of assent by the Board members. We consider the Board members' demonstration of "agreement" tantamount to a vote within the meaning of the act in these circumstances, and we decline to permit the Lynns' exercise in semantics to controvert that which is apparent from the Board minutes. Our resolution of this issue does not stop here, however, inasmuch as we note that the Association started compounding the late fee in February 1998, which was two months before the Board met and authorized such practice. R. at 940. We will not sanction retroactive application of the Board's decision to compound the late fee. Accordingly, we find that the Lynns' liability for compounded late fees is limited to those beginning in April 1998.

### E. Attorney Fees

Finally, the Lynns contend that the trial court erred in awarding at-

torney fees to the Association. We note that the trial court has broad discretion in awarding attorney fees, and we will not reverse unless the award is clearly against the logic and effect of the facts and circumstances before the court. *Holmes v. Holmes,* 726 N.E.2d 1276, 1285 (Ind.Ct. App.2000), *trans. denied.*

The contract provides for the award of such fees. Specifically, the Windridge Declaration states, in paragraph 27, that "In any proceeding arising because of failure of an Owner to make any payments required or to comply with any provision of the Declaration, the Act, the By-Laws, or the rules and regulations adopted thereto ... the Association shall be entitled to recover its reasonable attorneys' fees incurred in connection with such default or failure." R. at 841. Inasmuch as we have determined that the Lynns are liable to the Association for nonpayment of assessments, re-measure costs and late charges, the trial courts did not err in its award of attorney fees.

### CONCLUSION

In light of our discussion of the claims set forth above, we conclude that the trial court did not err in: 1) concluding that the Association lawfully assessed the Lynns for the additional square footage resulting from expansion of their condominium unit; 2) finding that the Lynns presented no credible evidence regarding damages or setoffs in defense of their nonpayment; 3) determining that the Lynns are responsible for assessments levied by the Association after their voting rights were suspended for nonpayment, and 4) awarding attorney fees to the Association. We also conclude that the Lynns are not responsible for the payment of compounded late fees for overdue assessments in February and March of 1998, but are liable for payment of compounded late fees levied from April 1998 onwards. Thus, we affirm the judgment but this cause is remanded to

the trial court for correction of the judgment.

Affirmed and remanded.

BROOK, J., and BARNES, J., concur.